UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KAREN M. MOE,

        Plaintiff,

    v.

UNITED STATES OF AMERICA,

        Defendant.

**DECISION AND ORDER**
06-CV-577A

---

I.     **INTRODUCTION**

Pending before the Court is the final resolution of plaintiff's damages claims, following a bench trial and subject to defendant's pending motion in limine. Plaintiff seeks both economic and non-economic damages stemming from a motor-vehicle accident in which an employee of defendant struck plaintiff's motorcycle while on duty with the United States Postal Service. Having previously awarded plaintiff summary judgment as to liability, the Court presided over a bench trial[1] as to damages on May 5, May 6, and June 23, 2010. After briefing from the parties, the Court held oral argument regarding proposed findings of fact and conclusions of law on October 15, 2010. Upon consideration

---

[1] As the federal government was the sole defendant in this case, the Federal Tort Claims Act ("FTCA"), 60 Stat. 842 (codified as amended in scattered sections of 28 U.S.C.), required the Court to conduct the trial without a jury. *See* 28 U.S.C. § 2402.

of all of the evidence admitted at trial and of all of the papers and arguments submitted by the parties, the Court will deny defendant's motion in limine and award plaintiff damages as explained below.

## II. BACKGROUND AND FINDINGS OF FACT

The following constitutes the Court's findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### A. *Pertinent Events*

This case concerns a motor vehicle accident that occurred on August 28, 2003, at the intersection of Tonawanda Creek Road and Orbit Drive in Amherst, New York. That day, postal worker Robin Truby[2] was delivering mail along her regular delivery route in the ordinary course of her employment with the United States Postal Service ("USPS"). The USPS considered Ms. Truby's delivery route to be a rural route. Although not a lot of background details emerged at trial, the nature of Ms. Truby's rural route and the logistics of accommodating rural routes led USPS to instruct Ms. Truby to work her delivery route in a particular way. In accordance with USPS instructions, Ms. Truby worked her route with her own vehicle, a white Buick LeSabre sedan. In contrast to USPS-issued delivery vehicles, which are built with or adapted to right-hand drive to place postal workers within arm's reach of rural mailboxes while driving, Ms.

---

[2] The Court found Ms. Truby generally credible to the extent that she could recall details of the accident.

Truby's personal vehicle featured the common left-hand drive configuration. To compensate for Ms. Truby's inability to reach mailboxes from the driver's side of her vehicle, USPS instructed her to sit in the front passenger's seat and to reach over with her left arm and left foot to operate the vehicle. Ms. Truby then would proceed to drive along the shoulder of any road on her route, stopping at each mailbox. The instructions that USPS gave Ms. Truby are important because the altered angles from which Ms. Truby would have been looking out of her vehicle's mirrors almost certainly factored into the events that followed.

A "misdelivery" at a mailbox set in motion the events leading to the accident at the heart of this case. As Ms. Truby testified, she was working her route without incident when she realized that she made a mistake with the delivery to the last mailbox behind her that she serviced. The mailbox in question was on Tonawanda Creek Road near the intersection of Orbit Road. Rather than put her vehicle into reverse to back up to the mailbox, Ms. Truby decided to return to that mailbox by driving forward through a double U-turn. That course of action required to Ms. Truby to cross both lanes of traffic twice,[3] once for each U-turn. Ms. Truby began this course of action by pulling out of the shoulder where she was and into the same flow of traffic in which her vehicle was pointed. As Ms. Truby pulled into traffic, she never saw plaintiff riding up the road on her

---

[3] At the time of the accident, Tonawanda Creek Road was a two-lane road with one lane in each direction.

3

motorcycle. The nature and timing of Ms. Truby's entrance into the flow of traffic caused plaintiff to slam into the side of Ms. Truby's vehicle. The collision threw plaintiff from her motorcycle and into the air. Plaintiff landed on a grassy area just off of Orbit Road, about 35–40 feet from Ms. Truby's vehicle. Resident Kurt Schultz,[4] on whose parcel plaintiff landed, recalled that plaintiff landed with her head pointed toward Orbit Road. Emergency responders treated plaintiff at the scene and then transported her to Erie County Medical Center.

The basic events of the accident, as the Court has summarized them above, led to a traffic citation to Ms. Truby for failure to yield the right of way when entering a roadway, in violation of N.Y. Vehicle and Traffic Law § 1143.[5] The accident, together with the resulting violations of the Vehicle and Traffic Law, persuaded this Court to adopt a Report and Recommendation from Magistrate Judge Leslie G. Foschio (Dkt. No. 20) and to grant plaintiff partial summary judgment as to liability.

**B.** *Damages*

The parties largely do not dispute some of plaintiff's damages claims. Plaintiff testified at trial that she briefly lost consciousness after the accident and

---

[4] The Court found Mr. Schultz generally credible to the extent that he could recall details of the accident.

[5] Ms. Truby later pled guilty to violations of Sections 1110(a) (failure to obey traffic-control devices) and 1201(a) (parking violation).

was in considerable pain when she regained consciousness.[6]  Emergency room physicians diagnosed plaintiff with a minor closed head injury, a comminuted fracture of the right clavicle, and three fractures in her right foot.  Plaintiff's injuries kept her out of work until late December 2003 and required physical therapy for about a year after the accident.  Plaintiff's mother, Luise Moe, testified credibly that she had to help plaintiff with meals, dressing, and bathing until plaintiff had regained enough strength to handle those activities on her own.  Plaintiff was able to return to full-time work in late December 2003 to her job as a team leader in the rod job department at the General Motors ("GM") Power Train plant in Tonawanda, New York.  Plaintiff has not lost time at work since, except for a few months in early 2006 that relate to strongly disputed injuries that the Court will address later.

With respect to the aspects of plaintiff's damages claims that the Court just described above, the only notable dispute between the parties concerns how the Court would calculate plaintiff's lost overtime wages if it chose to make an award for them.  Plaintiff seeks recovery for overtime hours lost between January and April 2006, based on the number of hours that would have been available to her under her employer's rules for overtime assignments.  GM labor relations official

---

[6] The Court found plaintiff generally credible with respect to details of her accident, her rehabilitation, and her shoulder problems.  The Court discounted her testimony about her foot pain to the extent that she testified about its severity beyond a chronic condition, related to the accident, that may worsen over time.

Kevin Barton testified credibly about how, in general, GM calculates how many overtime hours it needs from its employees and how it assigns those hours based on seniority. Mr. Barton's testimony, though generally credible, was of limited use to the Court because it did not address how many overtime hours plaintiff actually would have worked in early 2006. Defendant, accordingly, challenges the calculation of lost overtime hours as too speculative and asks the Court not to guess what overtime assignments plaintiff actually would have accepted and which she might have passed to co-workers with less seniority.

The parties strongly dispute plaintiff's claims of injuries to her right shoulder. Plaintiff submitted credible evidence that she took about a year after the accident to address her right clavicle fracture with conservative, non-surgical treatment and therapy. Plaintiff took this course of action on the advice of her treating physician, Dr. Marcus Romanowski, M.D.[7] Plaintiff returned to Dr. Romanowski in November 2004 to report ongoing pain and tenderness in her right shoulder. An x-ray showed that the clavicle fracture healed, leading Dr. Romanowski to recommend a non-surgical approach to plaintiff's complaint. Plaintiff returned to Dr. Romanowski again in August 2005 to report continuing pain and tenderness. Further x-rays and examination revealed that the clavicle fracture altered the alignment of plaintiff's shoulder joint in such a way that it

---

[7] The Court found Dr. Romanowski very credible with respect to his treatment and his connection between plaintiff's current shoulder condition and her clavicle.

6

began deteriorating and caused a rotator cuff tear. Dr. Romanowski performed arthroscopic surgery on plaintiff's right shoulder on January 20, 2006. Plaintiff missed work from January 20 through April 30, 2006. Defendant disputes plaintiff's injuries by submitting evidence that they do not relate to the accident but rather resemble repetitive-stress injuries that she has suffered intermittently for years. Although the Court considers credible the evidence of plaintiff's history with repetitive-stress injuries, it rejects defendant's attempt to label plaintiff's current shoulder condition as another such injury. The Court finds credible the testimony of Dr. Mark Mieth, M.D. to the extent that he found plaintiff to have symptoms of impingement syndrome at specific times in the past. Beyond that, however, defendant submitted insufficient evidence that plaintiff's repetitive-stress injuries did not resolve each time or were cumulative in nature. The Court finds that the chronic nature of plaintiff's present condition, coupled with the evidence of permanent shoulder realignment, makes her condition a consequence of her clavicle fracture. The Court will address later whether plaintiff's current condition qualifies legally as "newly discovered evidence" so as to defeat the pending motion in limine.

Similarly, the parties strongly dispute plaintiff's claims of injuries to her right foot. When plaintiff visited Dr. Romanowski visited in November 2004, she mentioned that she was experiencing foot pain. Dr. Romanowski referred plaintiff to Dr. Michael Parentis, M.D., who examined plaintiff in December 2004. Dr.

7

Parentis formed the credible medical opinion that the joint synovitis that he found in plaintiff's great toe had its origins in the fractures that the accident caused in her foot. Dr. Parentis formed the additional credible opinion that plaintiff's joint synovitis would have taken time to develop as a chronic consequence of the accident. Defendant challenges, more or less in its entirety, the evidence both of the severity of plaintiff's joint synovitis and of her experience of pain in dealing with it. The Court disagrees with most of defendant's challenge but agrees that the evidence is insufficient to regard plaintiff's foot condition as more than a chronic irritant, like a typical arthritic condition, that may undergo degenerative changes over time.

## III.  DISCUSSION

### A.  *Defendant's Motion in Limine*

As a preliminary matter, the Court will address defendant's motion in limine. Defendant seeks preclusion of any evidence pertaining to injuries in plaintiff's right shoulder and of any request for damages exceeding $750,000. Defendant seeks this relief because the FTCA limits claims to damages described in a timely filed claim form, and plaintiff's claim form does not use the word "shoulder." According to defendant, plaintiff treated for shoulder injuries before filing her claim and could have listed them on the claim form. Plaintiff asserts that her claims about her right shoulder are timely because they

developed over time as a result of her clavicle fracture and could not have been discovered within the usual time to file an administrative claim.

"Action under [the FTCA] shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). What "newly discovered evidence" means is straightforward:

> With respect to [plaintiff's shoulder injuries], for these considerations to constitute newly discovered evidence or intervening facts for purposes of 28 U.S.C. § 2675(b), several requirements must be satisfied. First, the evidence must support the increase in the prayer over the administrative claim. Next, the allegedly newly discovered evidence or intervening facts must not have been reasonably capable of detection at the time the administrative claim was filed. That is, while courts do not charge a claimant with knowing that the physicians could not tell him, the information must not have been discoverable through the exercise of reasonable diligence. Hence, we have allowed an increase over the amount administratively claimed when, at the time the claim was filed, the claimant did not know and could not have ascertained that an injury would not heal without surgery. An increase has likewise been allowed when the specialists on whom the claimant reasonably relied could not reasonably have known the true nature or extent of the claimant's illness. These various requirements are consistent with our recent observations on the policy underlying 28 U.S.C. § 2675(b) . . . . Section 2675 should be interpreted so that "[t]he government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions."

*Low v. U.S.*, 795 F.2d 466, 470–71 (5th Cir. 1986) (citations omitted).

Here, the original claim form that plaintiff timely submitted stated that "Karen Moe sustained a fracture to her right collar bone and fractures to her foot which required surgery and external fixation." The mention of the clavicle fracture kept the door open for any injuries arising from it that could not have been detected at the time of the filing of the claim. As noted above, plaintiff has submitted sufficient credible evidence indicating that she has developed chronic shoulder joint irritation because the accident in question left her with a realigned shoulder structure. Further, plaintiff has submitted sufficient credible evidence that she could not have discovered her developing chronic irritation until reasonably planned conservative management failed and an eventual MRI revealed a partial rotator cuff tear. Under these circumstances, the only way to reject plaintiff's shoulder irritation as newly discovered evidence would be to hold that plaintiff should have insisted on additional testing even while her treating physician was acting reasonably in thinking that conservative management would suffice. The Court finds no reason to hold plaintiff to such a high level of anticipatory preventive medicine. Accordingly, the Court denies defendant's motion in limine and includes the evidence of plaintiff's shoulder irritation with the other evidence of injuries that she has submitted.

B.   *General Standards for Assessing Damages*

The Court now turns to the task of converting its factual findings into a damages award. Two general evidentiary principles will be helpful in crafting an

appropriate award. First, "[d]amages in FTCA actions are determined by the law of the state in which the tort occurred. Generally, under New York law a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1081–82 (2d Cir. 1988) (citations omitted). Second, while the damages award in this case ultimately must fit plaintiff's particular circumstances, jury verdicts in cases involving similar injuries can provide some guidance. *See, e.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 425 (1996) ("To determine whether an award deviates materially from what would be reasonable compensation, New York state courts look to awards approved in similar cases.") (internal quotation marks and citations omitted); *Furey v. U.S.*, 458 F. Supp. 2d 48, 56–57 (N.D.N.Y. 2006) ("When determining pain and suffering awards, courts often look to awards in similar cases.") (citations omitted).

### C. *Assessing Plaintiff's Injuries*

#### 1. *Economic Injuries*

"Pecuniary damages assess the economic consequences of an injury and include medical expenses, lost earnings and the cost of care." *Furey*, 458 F. Supp. 2d at 56 (citations omitted). Here, the parties have stipulated to medical expenses in the amount of $11,242.82. The Court will award those expenses. Plaintiff has stated that she is not making any claim for lost wages for straight time. Instead, plaintiff seeks reimbursement for the "lost opportunity" to work

11

276.3 hours of overtime and 48 hours of double time that GM needed its employees to work from January 20, 2006 through April 30, 2006, when plaintiff missed work because of her shoulder surgery.  Plaintiff asserts that she had the opportunity to work all of the hours that were required during that time because of her seniority and qualifications at the plant.  Plaintiff, however, has submitted insufficient evidence of a history of working all overtime hours available to her.  Without at least some evidence that plaintiff repeatedly pulled rank on her co-workers and snapped up all available overtime opportunities, the Court has no way of knowing whether plaintiff *would have* worked over 300 hours of overtime in the first quarter of 2006 simply because she *could have*.  *Cf., e.g., Walsh v. State*, 648 N.Y.S.2d 816, 818 (App. Div. 1996) ("Although there was testimony that before the accident claimant was paid for overtime which will no longer be available to him, there was no proof as to the amount of overtime worked or the level of additional compensation he received.  Consequently, the allocation of $300,000 in recompense for loss of the opportunity to perform such work is wholly speculative and unsustainable.") (citation omitted).  Accordingly, the Court declines to make any award for lost overtime.

    2.    *Non-economic Injuries*

"In New York, the term 'pain and suffering' encompasses all items of general, non-pecuniary damages and includes the physical and emotional consequences of an injury.  It also includes the loss of the enjoyment of life which

compensates for the frustration and anguish caused by the inability to participate in activities that once brought pleasure." *Furey*, 458 F. Supp. 2d at 56 (citations omitted).

With respect to past pain and suffering, the Court finds that an injury award is appropriate for several aspects of what plaintiff experienced after the accident. The accident caused multiple fractures in plaintiff's right foot and shattered her right clavicle. The accident also left plaintiff with the lasting memory of slamming into the side of a car, flying through the air, and landing 30–45 feet away in significant pain, a memory tempered only by her momentary loss of consciousness at the accident scene. Months of painful recovery and rehabilitation followed, during which plaintiff relied heavily on her mother's care. Plaintiff eventually returned to work on a full-time basis, but the good fortune of such a recovery does not nullify the pain and suffering that she experienced. Although prior verdicts in other state and federal cases can only provide guidance, the Court finds that the facts of the present case resemble the facts and the resulting verdict in *Lufker v. Jeheber*, 2010 WL 3028733 (N.Y. Sup. Ct. 2010). Upon considering all of the evidence that the parties submitted and the comparable cases that the parties brought to the Court's attention, the Court awards plaintiff $300,000 for past pain and suffering.

With respect to future pain and suffering, the challenge is how to place a monetary value on chronic irritations that will persist regardless of whether they worsen or stay the same. The Court agrees with plaintiff that her actuarial life expectancy is just under 32 years. In light of its finding that plaintiff's shoulder irritation and joint synovitis developed as a result of the accident, the Court recognizes that for the next 32 years, plaintiff will have to wake up every morning with chronic pain. These chronic conditions appear to have had only a marginal impact on plaintiff's ability to work her job and to live her daily life. That said, these conditions never will go away. Additionally, the realignment in plaintiff's shoulder may very well create the need for additional surgery and additional rehabilitation over the next 32 years. Upon considering all of the evidence that the parties submitted and the comparable cases that the party brought to the Court's attention, the Court awards plaintiff $150,000 for future pain and suffering.

## IV. CONCLUSION

For all of the foregoing reasons, the Court denies defendant's motion in limine (Dkt. No. 25). The Court awards plaintiff $300,000 for past pain and suffering, $150,000 for future pain and suffering, and $11,242.82 for medical expenses incurred. Pursuant to 28 U.S.C. § 2674, the Court does not award pre-judgment interest.

As all trial proceedings now have concluded, the Clerk of the Court is directed to close this case.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: December 2, 2010